Malihe Kigasari
E-Mail: mali.kigasari@gmail.com
601 Van Ness Ave., #908
San Francisco, CA 94102
Tel: (510) 409-8604

Pro se

**FILED**
MAR -2 2020
SUSAN Y. SOONG
CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

CV 20 1521 KAW

| | |
|---|---|
| Malihe Kigasari, <br><br> Plaintiff, <br><br> v. <br><br> Janet Dhillon, Chair, U.S. Equal Employment Opportunity Commission, <br><br> Defendant. | Case No. <br> **PLAINTIFF'S COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF** <br><br> 1. Discrimination – Title VII (42 U.S.C. § 2000e, *et seq.*); <br><br> 2. Discrimination – ADEA (29 U.S.C. § 621); <br><br> 3. Retaliation – Title VII 42 U.S.C. § 2000e, *et seq.*) <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff Malihe Kigasari alleges as follows:

## INTRODUCTION

1. Plaintiff Malihe Kigasari was a Bilingual Federal Investigator for the United States Equal Opportunity Commission (EEOC) San Francisco District Office (SFDO) from January 2009 until February 2019.

2. She brings this Title VII and ADEA action for discrimination and retaliation perpetrated by her supervisors at the EEOC.

3. She alleges that the Agency subjected her to discrimination and retaliation when, immediately after she complained of discrimination, it investigated her for conduct unbecoming a federal employee and suspended her for two weeks without pay. The Agency conducted investigations into other SFDO employees outside Ms. Kigasari's protected class for similar alleged conduct. The Agency conducted these investigations in a fairer and more favorable manner and the individuals investigated were subjected to much less harsh punishment than was Ms. Kigasari. The inescapable conclusion is that the Agency discriminated and retaliated against Ms. Kigasari in the manner and the results of the investigation and suspension.

4. With respect to awards claim, Ms. Kigasari met the stated criteria for FY 2011 awards. Yet the Agency neither nominated Ms. Kigasari for nor provided her any monetary awards. Similarly situated investigators outside her protected class were given monetary awards. Thus, the Agency discriminated and retaliated against Ms. Kigasari in awards.

5. Regarding intern assignments, after Ms. Kigasari engaged in protected EEO activity, the Agency removed an intern from Ms. Kigasari's supervision for reasons that were patently baseless.

6. Finally, the Agency denied Ms. Kigasari certain case assignments in a manner that was discriminatory and retaliatory.

## JURISDICTION AND VENUE

7. This court has jurisdiction over the subject matter pursuant to 28 U.S.C. §§ 1331, 1343(a)(4). This action arises under federal law: Title VII of the Civil Rights Act of 1964, 42

1    Case No. 19-cv-250
PLAINTIFF'S COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

U.S.C. § 2000e, *et seq.* and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et seq.*.

8. Venue is proper in the Northern District of California pursuant to 28 U.S.C. § 1391(e), because the unlawful practices alleged in this complaint occurred in the Northern District of California.

## INTRADISTRICT ASSIGNMENT

9. Assignment of this action to the San Francisco Division of this Court is proper pursuant to Local Rule 3-2(c) and (d) because the events giving rise to this action occurred in San Francisco County, California.

## PARTIES

10. Plaintiff Malihe Kigasari is, and at all relevant times was, a resident of the Northern District of California and was employed by Defendant EEOC at its San Francisco District Office in San Francisco.

11. Defendant Janet Dhillon is the Chair of the Equal Employment Opportunity Commission and is therefore head of the relevant executive agency. Accordingly, Ms. Dhillon is named as defendant in this action pursuant to 28 U.S.C. § 2000e-16(c). Defendant is sued in her official capacity only.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

12. Plaintiff Malihe Kigasari filed an informal EEO complaint on July 25, 2011, followed by a formal EEO complaint on approximately November 4, 2011. She participated in an unsuccessful effort to informally resolve her complaint on November 9, 2011. On March 8, 2012, Ms. Kigasari amended her EEO complaint. The Agency issued notices of Accepted Claims on December 15, 2011, January 4, 2012 and March 20, 2012. On September 4, 2012, the Office of Equal Employment completed the Agency investigation and provided the Summary and Record of Investigation. Ms. Kigasari moved to further amend her Complaint on February 15, 2013 and this amendment was accepted on March 12, 2013.

13. On February 28, 2014, the assigned Administrative Judge (AJ), after hearing three days of testimony, ruled in favor of Complainant on her Suspension Claim and supported her order

with detailed factual findings, including well-founded credibility determinations. On May 20, 2014, the Agency issued a final order rejecting the AJ's Order and simultaneously appealed. On June 18, 2014, Complainant cross-appealed. The matter was fully briefed by September 17, 2014. On July 31, 2018, the Agency found in favor of the Agency and Plaintiff timely moved for reconsideration. On November 29, 2019, the Agency mailed its decision on Plaintiff's request for reconsideration and affirmed its prior decision.

14. Plaintiff has fully exhausted her administrative remedies and is entitled to file in the district court and is timely filing this Complaint.

## FACTS

### *Background on Ms. Kigasari and the EEOC SFDO.*

15. Malihe Kigasari served as an EEOC Investigator beginning on January 5, 2009. She worked for the San Francisco District Office (SFDO) until she retired February 28, 2019. Ms. Kigasari's direct supervisor was Scott Doughtie. Deborah Randall was the Enforcement Manager and supervised Supervisor Doughtie. The District Director was Mike Baldonado.

16. Ms. Kigasari was a bilingual (Spanish-speaking) investigator who speaks at least four languages. She is a gender non-conforming woman and believes she is the only gender non-conforming woman at the EEOC office. She also is an out lesbian. She is one of two out lesbian Investigators at the SFDO. She is white and of Iranian national origin. Furthermore, she was over the age of 50 at the time of the relevant events. Ms. Kigasari believed she was the only investigator in her fifties under Manager Randall. She started as a GS-7 and was promoted to a GS-9, GS-11 and GS-12.

### *Manager Randall Engaged in Gender Stereotyping and Instructed Supervisor Doughtie to Verbally Counsel Ms. Kigasari for Being "Anti-Male"*

17. In July 2009 Ms. Kigasari's manager, Manager Randall made a remark that indicated her belief that female investigators should keep a pair of high-heeled shoes (black pumps) at the office so they could dress professionally. Ms. Kigasari informed Manager Randall that she did not own any high heels.

18. Also, in or around July 2009, Manager Randall was involved in selecting six new investigators for the SFDO. All five new hires were males. One female was promoted from ADR Coordinator Assistant to Investigator.

19. Ms. Kigasari commented on the gender composition of the new group of investigators, noting that five male investigators were hired in place of some of the female investigators who had left the SFDO. Manager Randall indicated her displeasure with Ms. Kigasari's comments about gender. In that same month, July 2009, Manager Randall told Supervisor Doughtie to give Ms. Kigasari a verbal warning for being "anti-male." Supervisor Doughtie was uncomfortable with this instruction because he did not think the comments warranted a verbal warning because they "were just not serious enough" but he complied with Manager Randall's directive after she asked him for the third time to do so. Ms. Kigasari objected to this warning and specifically referenced her concerns about being subjected to gender stereotyping because of her sexual orientation.

### Tiberius Wallace Investigations.

20. One of the six new investigators Manager Randall hired was Tiberius Wallace. Investigator Wallace was a young (under 40), heterosexual, African-Canadian male, gender conforming, not of Iranian national origin. Investigator Wallace regularly engaged in inappropriate behavior at work.

21. Deputy Director Michael Connolly conducted an investigation in March 2010 (about incidents with Investigator Wallace in January 2010). Deputy Connolly's investigation substantiated that many employees had problems with Investigator Wallace's behavior. Director Baldonado thought Deputy Connolly's investigation was a good one and believed that "quite a few people" had problems with Investigator Wallace and that Investigator Wallace's conduct was a problem. Nevertheless, Investigator Wallace was not disciplined for these serious incidents of misconduct.

22. In March 2012, Deputy Connolly received an inquiry from the U.S. Department of Labor about a job application Investigator Wallace had submitted to them. Investigator Wallace had misrepresented his grade and his position (falsely stating he was a GS 11 and supervisor). Deputy

Connolly investigated Investigator Wallace for falsification of official information and felt strongly that Investigator Wallace did falsify the information. Indeed, Investigator Wallace admitted during the investigation that he stated that he was a supervisor (because he was a supervisor of his own work). Deputy Connolly considered Investigator Wallace's conduct to be "conduct unbecoming [a federal employee]." Falsification of government documents was a serious offence, nevertheless, the Agency merely issued Investigator Wallace a letter of reprimand (dated March 15, 2012). The letter stated that it would be placed in Investigator Wallace's personnel file for up to 12 months. Director Baldonado confirmed that this letter would "evaporate" in a year and that then no future potential employer would see it. Investigator Wallace continued to work at the EEOC until June 2012, when he left of his own accord to take a job in Maui, Hawaii.

*Ealy Bennett Investigation.*

23. On May 4, 2011, Ms. Kigasari attended a union meeting in San Francisco at which Ealy Bennett, and a number of other employees were present. AJ Bennett is an African-American male and was an Administrative Judge at the time. At this meeting, AJ Bennett said that Ms. Kigasari was a "closeted bigot." He accused Ms. Kigasari of saying "Don't assign cases to that N-word." When Ms. Kigasari protested that this was not true, she heard AJ Bennett call her a "cunt" under his breath. Ms. Kigasari then said out loud "Did you just call me a cunt?"

24. Nearly all people who attended the meeting confirmed that AJ Bennett accused Ms. Kigasari of using the N-word in connection with case assignments. There were a number of witnesses at the meeting who heard AJ Bennett say something consistent with the word "cunt" as Ms. Kigasari alleged. Numerous witnesses confirmed that AJ Bennett was known to curse and use profanity in the office. Chief AJ Terry Brodie testified that she overheard Bennett in his office saying "I am going to kill that bitch" in reference to Ms. Kigasari.

25. On the same day as the union meeting (May 4, 2011), Ms. Kigasari complained to Director Baldonado about AJ Bennett's accusing her of using the N-word and calling her a cunt. Director Baldonado said that he would look into it, conduct an investigation and get back to her.

26. Ms. Kigasari went to Supervisor Doughtie and told him about what she alleged AJ Bennett said. Supervisor Doughtie took no notes of this meeting with Ms. Kigasari regarding her

complaint of being accused of using the N-word and of being called a "cunt" even though he believed Ms. Kigasari's allegation and agreed that it was a serious alleged slur.

27. Supervisor Doughtie then went next to speak to Manager Randall because he "always keeps her informed of what's going on." He reported to Manager Randall throughout his investigation.

28. Supervisor Doughtie testified that his next meeting was with AJ Brodie, AJ Bennett's supervisor. He never spoke to AJ Brodie about Ms. Kigasari's allegations against AJ Bennett. Instead, AJ Brodie told Supervisor Doughtie to talk to Amber Turner (an EEOC Office Automation Assistant (OAA)). Although Supervisor Doughtie thought it was odd that AJ Brodie told him to talk to Ms. Turner, Supervisor Doughtie went to speak to Ms. Turner.

29. Eventually, Ms. Turner recounted an incident that allegedly occurred on Friday, April 27, 2011. Ms. Turner stated that Ms. Kigasari went to Ms. Turner and Office Automation Assistant (OAA) Rosario Reyes, who occupied the neighboring cubicle, and asked them who they were going to vote for in the union election. Ms. Turner alleged Ms. Kigasari then said "Well don't vote for that N-word." Supervisor Doughtie assumed that the reference was to David Skillman, an African-American Union Vice-President. Ms. Turner identified Ms. Reyes as the sole eyewitness to this alleged conversation and the union election.

30. When Supervisor Doughtie interviewed Ms. Reyes, the "key witness" and the "only and most important witness," Ms. Reyes categorically (and repeatedly) denied, including under oath, that Ms. Kigasari ever used the N-word. Ms. Reyes was Ms. Turner's identified eyewitness and she was the only witness to submit an affidavit under penalty of perjury during the Doughtie investigation. She stated under oath that Ms. Kigasari did not use the N-word. Director Baldonado had worked with Ms. Reyes for 21 years and believed her to be a truthful person. Manager Randall has known Ms. Reyes for 24 or 25 years and thought she was a good person and a truthful person. Yet Supervisor Doughtie rejected Ms. Reyes account.

*Malihe Kigasari Investigation.*

31. After Supervisor Doughtie heard Ms. Turner's allegations about the N-word, Supervisor Doughtie decided to begin an investigation into Ms. Turner's allegations. However, he

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE RELIEF AND DEMAND FOR JURY TRIAL

was not sure about conducting an investigation into Ms. Kigasari's allegations about AJ Bennett. In fact, once Supervisor Doughtie heard Ms. Turner's claim, his investigation of Ms. Kigasari's allegations "merged" with his investigation of Ms. Turner's allegations. And by merged, Supervisor Doughtie meant that Ms. Kigasari's complaint about AJ Bennett "became an investigation into misconduct by [Ms. Kigasari]." Thus, although Supervisor Doughtie agreed that the "cunt" and the N-word were both the most offensive words one could say, he discontinued his investigation into Ms. Kigasari's allegation that she was falsely accused of using the N-word and called a "cunt," and only investigated Ms. Turner's allegations.

32. In fact, Supervisor Doughtie's investigation into Ms. Kigasari's allegations did not result in any written investigation report much less any reprimand or any other action taken against AJ Bennett. Indeed, Supervisor Doughtie never even told Ms. Kigasari the outcome of his alleged investigation into AJ Bennett.

33. After Supervisor Doughtie interviewed Ms. Kigasari on May 10, 2011, it became clear to her that he was targeting her for investigation. Once Supervisor Doughtie interviewed her, Ms. Kigasari wrote to Director Baldonado on May 16, 2011 and asked him to assign a neutral investigator and explained why she believed Supervisor Doughtie was conducting a biased investigation. Based on her knowledge at the time, she listed reasons including the following: He was her supervisor and had been at a mediation with her in connection with a grievance she filed; He was friends with David Skillman; He had given Ms. Kigasari a warning for being anti-male; He took selective notes; He pressured Ms. Reyes to change her account. Ms. Kigasari stated that she thought she might have been targeted because of her sexual orientation and her national origin. Director Baldonado never responded to Ms. Kigasari's letter.

34. Supervisor Doughtie continued with his investigation of Ms. Turner's allegation but he failed to interview Ms. Kigasari's identified witness Will Su who was present at the union meeting. Supervisor Doughtie also failed to interview three women who were present at the union meeting: Debra Smith, Cindy O'Hara and Krystal Clark. Supervisor Doughtie failed to interview his friend David Skillman, even though he was supposedly the first person Ms. Turner told about this allegation against Ms. Kigasari.

35. Supervisor Doughtie failed to record accurate notes of his interviews with witnesses. For example, he acknowledged that his notes for two witnesses, Tom Magee and Sonya Crocker, were nearly identical even those two individuals did not say identical words in his interviews of them. Supervisor Doughtie admitted that Investigator Magee, Supervisor Doughtie's good friend, wrote an affidavit complaining that Supervisor Doughtie's notes were inaccurate and that he in fact had told Supervisor Doughtie that he corroborated Ms. Kigasari's allegation of AJ Bennett using the C-word. Investigator Magee also complained to Deputy Connolly that Supervisor Doughtie's notes were inaccurate.

36. Director Baldonado and Supervisor Doughtie credited Ms. Turner with consistency. Yet, there undisputedly were inconsistencies in her story. AJ Bennett's statement at the union meeting was that Ms. Kigasari said not to "assign cases" to that N-word. When Supervisor Doughtie interviewed Ms. Turner, she alleged Ms. Kigasari said not to "vote" for that N-word. In any event, Ms. Turner had stated that Ms. Kigasari used the word once. At her deposition in connection with this case, Ms. Turner incredibly changed her story again, first testifying that Ms. Kigasari said "don't vote for that n-----" and then stating that Ms. Kigasari actually said it twice (the second time she supposedly said "I am not going to vote for that N-word." Prior to her deposition, Ms. Turner had never claimed or reported that Ms. Kigasari allegedly used the term twice. Mr. Skillman testified that when Ms. Turner told him the story about what happened, she indicated she had merely overheard Ms. Kigasari speaking with Ms. Reyes and Ms. Turner was not part of the conversation. That account was of course different from Ms. Turner's statement.

37. Supervisor Doughtie interviewed Ms. Turner at least twice. According to Supervisor Doughtie's notes, she gave him two different dates for the alleged incident (April 27 and April 29). Supervisor Doughtie testified that he told Manager Randall and Deputy Connolly that "someone else should interview Amber [Turner]" to assess Ms. Turner's credibility but nobody did. Ms. Turner was never asked to submit a statement under penalty of perjury. Indeed, Supervisor Doughtie only obtained a sworn affidavit from one individual, Ms. Reyes. He never obtained such an affidavit from Ms. Turner, Ms. Kigasari or AJ Bennett.

38. Supervisor Doughtie was a very experienced EEO investigator. In fact, at the time of the investigation, he had been an investigator for 19 years. Yet, Supervisor Doughtie failed to check whether Ms. Kigasari was even at work on the alleged Friday of the incident, even though he knew she was on a 5-4-9 schedule wherein she had every other Friday off. Ms. Turner also had such a 5-4-9 schedule. Deputy Connolly commented that the Doughtie Kigasari Investigation was not as tight-knit as the Local Director Dana Johnson's Marrs Investigation.

39. Deputy Connolly did not believe it was in Ms. Kigasari's character to use the N-word. He repeated, "I personally don't believe it." AJ Brodie said that she did not have any reason to believe Ms. Kigasari would utter such an epithet. AJ Marianna Warmee stated that Ms. Kigasari is "an exceptionally honest person who values integrity above all else. [She] never judges others on the basis of … race, color, sexual orientation, or any other immutable characteristic…. I do not believe that Malihe engaged in the conduct cited as the basis for her suspension in 2011."

40. Yet, on June 22, 2011, Supervisor Doughtie issued a Notice of Proposed Suspension for Ms. Kigasari based on his finding Ms. Kigasari used the N-word. One of the reasons Supervisor Doughtie gave in support of Ms. Kigasari's proposed suspension was her alleged conflict with Investigator Wallace. However, it is undisputed that numerous investigators in the office had problems with Investigator Wallace. Supervisor Doughtie also cited, in support of his proposed suspension, a dispute he had with Ms. Kigasari over the interview of an alleged sexual harasser in the course of an investigation. Ms. Kigasari and Supervisor Doughtie disagreed about the approach to the interview with the harasser who happened to be Black. The final reason Supervisor Doughtie cited in support of the proposed suspension was an alleged problem Ms. Kigasari had with a Black charging party. Supervisor Doughtie even went so far as to say he had told Manager Randall not to assign cases to Ms. Kigasari that involved Black male charging parties. However, Supervisor Doughtie never mentioned this alleged concern to Ms. Kigasari not mentioned it in any of her performance reviews. Moreover, Director Baldonado testified that he had not received any complaints about Investigator Kigasari from charging parties.

41. On June 29, 2011, Ms. Kigasari wrote a detailed 9-page response to the Notice of Proposed Suspension with 15 supporting exhibits. The exhibits included affidavits from Rosario

PLAINTIFF'S COMPLAINT FOR DAMAGES AND DECLARATORY AND INJUNCTIVE
RELIEF AND DEMAND FOR JURY TRIAL

Reyes (stating "I felt extremely intimidated and pressured by Scott [Doughtie] to change my statements…During all three interviews with Scott [Doughtie] I was truthful and said the same thing-Mali did not use the N-word."); Tom Magee (explaining, *inter alia*, what he heard at the union meeting and how Supervisor Doughtie's interview notes were inaccurate); Malinda Tuazon (explaining that she too had complained about Investigator Wallace); Debra Smith (explaining, *inter alia*, what she heard at the union meeting). The exhibits also included an email from a few months before Supervisor Doughtie's investigation of Ms. Kigasari, noting a Black charging party who had complimented Ms. Kigasari on her professionalism.

42. Ms. Kigasari received no response to her submission protesting her proposed suspension. On July 13, 2011, the EEOC issued a Notice of Decision on the Proposed Suspension. The Agency subjected Ms. Kigasari to a two-week suspension without pay, the only such discipline the SFDO had ever inflicted, as far as Supervisor Doughtie was aware. And Supervisor Doughtie believed that the discipline should have been even harsher--he recommended termination. Director Baldonado agreed. Despite the fact that there was no corroboration for Ms. Turner's allegation, Supervisor Doughtie never considered alternatives other than suspension or discharge for Ms. Kigasari.

43. Ms. Kigasari served the two-week suspension without pay in from July 18-July 31, 2011. The suspension remains in her permanent record.

***Jerry Marrs Investigation.***

44. In the EEOC's San Jose field office, Investigator Jerry Marrs made a number of offensive remarks directed at Latinos and gay people. Investigator Marrs was under 40, heterosexual, White male, gender conforming, not of Iranian national origin. Investigator Marrs had been hired after Ms. Kigasari. Dana Johnson, San Jose Local Director, conducted a thorough investigation of the incident. She interviewed percipient witnesses who all confirmed Marrs' comments. Local Director Johnson then wrote an investigation report ("Investigation Summary"), concluding that Investigator Marrs engaged in the conduct alleged and recommending a two-week suspension. EEOC SFDO gave Investigator Marrs a Notice of Proposed suspension document, proposing to suspend him for 7 days. Director Baldonado testified that Investigator Marrs should

have been terminated. However, there is no evidence that Investigator Marrs ever even received a final suspension notice. Investigator Marrs never served his suspension. Investigator Marrs resigned from the EEOC in 2013.

*EEOC Pride.*

45.  In Spring 2011, Ms. Kigasari was the lead organizer of EEOC Pride's celebration of Commissioner Chai Feldblum. Ms. Kigasari believed that the increased visibility of the LGBT employees was not welcomed by everyone at the SFDO.

*Awards.*

46.  For FY 2011, EEOC Headquarters had allocated a substantial sum of money and time off (cash awards $46,600 and 816 hours of time off awards) to be distributed to employees in the SFDO. Although Ms. Kigasari was a productive investigator, she received only 8 hours of time off (the same as everyone else who nominally participated in the EEOC Pride event).

47.  One measure for awards was "merit factors." Merit factors are indicated in an Investigator's Resolution Report at the end of the year. These factors represent tallies of investigative tasks such conciliations and settlements. Ms. Kigasari had the highest merit factors of any investigator in the SFDO in FY 2011. Another factor for awards was using language skills. Director Baldonado acknowledged that Ms. Kigasari used her Persian/Farsi skills to assist another office and that was "not part of her job."

48.  Yet Supervisor Doughtie failed to nominate Ms. Kigasari for an award in FY 2011 (or any other year). Supervisor Doughtie claimed that he did not nominate anyone for an award in FY 2011, but in fact he did nominate Investigators outside of Ms. Kigasari's protected class.

49.  Manager Randall also did not nominate Ms. Kigasari for an award in FY 2011 but she did nominate other investigators outside of Ms. Kigasari's protected class. Deputy Connolly testified that a supervisor had to nominate an employee for an award and he did not know why Ms. Kigasari was not nominated.

*Intern Reassignment.*

50.  In Spring 2012, SFDO's practice was that investigators were assigned the interns they recruited. Interns are beneficial to the investigators because they assist in their productivity. In

Spring 2011, Ms. Kigasari began teaching an employment law course at the San Francisco State University College of Extended Learning Paralegal Studies Program. One of her students, Sofia Nixon also was enrolled in an internship course and elected to work with Ms. Kigasari at the EEOC. On January 26, 2012, Manager Randall learned that Intern Nixon was taking Ms. Kigasari's class and stated it was a conflict of interest. Therefore, on the same day, Manager Randall reassigned Intern Nixon to Investigator Joe Einikis. Although Manager Randall initially told Ms. Kigasari that she had consulted with the "ethics committee" about this matter, Director Baldonado testified that there was no "ethics committee." In fact, Manger Randall consulted with Director Baldonado only after Ms. Kigasari went to Director Baldonado and complained about the removal of her intern. Intern Nixon was upset that she could not work with Ms. Kigasari and left the Enforcement Unit altogether. Despite Manager Randall's assertions, the Designated Agency Ethics Official, Thomas Schlageter, stated that there was no conflict of interest in Ms. Kigasari teaching at SFSU paralegal studies and having interns work for her at the EEOC.

### FIRST CLAIM FOR RELIEF
### Discrimination on the Basis of
### Sex, Gender, Gender Non-conformity, Sex Stereotyping, Sexual Orientation, National Origin, and Race
### (Title VII, 42 U.S.C. §§ 2000e, et. seq.)

51. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully stated here.

52. Title VII prohibits Defendant from discriminating against any employee on the basis of sex, gender, gender non-conformity, sex stereotyping, sexual orientation, national origin, and race.

53. In perpetrating the above-described acts and omissions, Defendant, its agents, servants, and/or employees, engaged in unlawful discrimination on the basis of sex, gender, gender non-conformity, sex stereotyping, sexual orientation, national origin, and race in violation of Title VII.

54. As a direct and proximate result of Defendant's unlawful acts, Plaintiff has suffered and continues to suffer lost wages, employment benefits, pension benefits and other compensation, in an amount to be proven at trial.

55. As a further proximate result of Defendant's unlawful acts, Plaintiff has suffered and continues to suffer injury, including emotional pain and suffering, and she is accordingly entitled to an award of compensatory damages

56. Plaintiff is entitled to statutory attorneys' fees and costs, and other appropriate relief as determined by this court.

## SECOND CLAIM FOR RELIEF
### Discrimination on the Basis of Age
(Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, et seq.)

57. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully stated here.

58. The ADEA makes it unlawful for an employer to discriminate against an individual because of the individual's age. 29 U.S.C. § 623(a). The ADEA's prohibition against age discrimination is limited to individuals over 40 years of age. 29 U.S.C. § 631(a).

59. At all times relevant to this action, Plaintiff was an individual over 40 years of age.

60. In violation of Plaintiff's right under the ADEA to be free from age-based discrimination with regard to the terms and conditions of her employment, Defendant has discriminated against Plaintiff on the basis of her age.

61. As a direct and proximate result of Defendant's unlawful acts, Plaintiff has suffered and continues to suffer lost wages, employment benefits, pension benefits and other compensation, in an amount to be proven at trial.

62. As a further proximate result of Defendant's unlawful acts, Plaintiff has suffered and continues to suffer injury, including emotional pain and suffering, and he is accordingly entitled to an award of compensatory damages.

63. Plaintiff is entitled to statutory attorneys' fees and costs, and other appropriate relief as determined by this court.

## THIRD CLAIM FOR RELIEF
### Retaliation
(Title VII, 42 U.S.C. §§ 2000e, et seq.)

64. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully stated here.

65. Title VII prohibits Defendant from retaliating against any employee because she engaged in a protected activity. Resisting and/or complaining of discrimination or harassment is a protected activity under Title VII.

66. Defendant and its agents, servants, and/or employees, engaged in unlawful retaliation in violation of Title VII.

67. Plaintiff engaged in protected activity.

68. Defendant, its agents, and/or employees retaliated against Plaintiff on the basis of her protected activity, and took material and adverse employment actions against her.

69. As a direct and proximate result of Defendant's unlawful acts, Plaintiff has suffered and continues to suffer lost wages, employment benefits, pension benefits and other compensation, in an amount to be proven at trial.

70. As a further proximate result of Defendant's unlawful acts, Plaintiff has suffered and continues to suffer injury, including emotional pain and suffering, and he is accordingly entitled to an award of compensatory damages.

71. Plaintiff is entitled to statutory attorneys' fees and costs, and other appropriate relief as determined by this court.

### INJUNCTIVE RELIEF

72. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully stated here.

73. Plaintiff seeks injunctive relief.

74. No previous application for injunctive relief sought herein has been made to this Court.

75. If this Court does not grant the injunctive relief sought herein, Plaintiff will be irreparably harmed.

76. No plain, adequate, or complete remedy at law is available to Plaintiff to redress the wrongs addressed herein.

## DECLARATORY RELIEF

77. Plaintiff incorporates by reference each and every allegation contained in the preceding paragraphs as though fully stated here.

78. An actual controversy has arisen and now exists relating to the rights and duties of the parties herein in that Plaintiff contend that Defendant violated her rights not to be subjected to discrimination and retaliation. Defendant denies these allegations. Declaratory relief is therefore necessary and appropriate.

79. Plaintiff seeks a judicial declaration of the rights and duties of the respective parties.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

1. For declaratory judgment that the practices complained of in this complaint are unlawful and violate Title VII and the ADEA;
2. For injunctive relief;
3. For compensation denied or lost to Plaintiff by reason of the unlawful acts alleged herein, in an amount to be proven at trial;
4. For payment of compensatory damages for Plaintiff's emotional pain and suffering, in an amount to be proven at trial;
5. For Plaintiff's attorneys' fees and costs;
6. For payment of interest at the legal rate on such damages as appropriate, including pre- and post- judgment interest; and
7. For any further relief that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, hereby demands a trial by jury of each and every cause of action so triable.

DATED: March 1, 2020

By: _____
Malihe Kigasari
*Pro Se*